**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
MUHAMED BOJA

            Plaintiff,

    -against-

THE CITY OF NEW YORK; NYPD
MEMBER JOAN A. FERREIRA; NYPD
MEMBER LUIS HIRALDOGARCIA; NYPD
MEMBERS JOHN AND JANE DOES #1-4

            Defendants.

-------------------------------------------------------X

Case No. 26-cv-2738

**COMPLAINT AND**
**JURY DEMAND**

Plaintiff, Muhamed Boja by and through his attorneys, Wylie Stecklow, PLLC and Lovelace Law, PLLC, hereby alleges the following conduct of Defendants, and states the following causes of action based thereon:

## PRELIMINARY STATEMENT

1. On May 18th, 2024, Plaintiff Muhamed Boja (Mr. Boja) attended a Nakba Day rally to exercise his First Amendment Rights and peacefully participate in an anti-war protest.

2. The New York City Police Department ("NYPD") has utilized aggressive tactics aimed at targeting the constitutional rights of individuals protesting on behalf of human rights, including, *inter alia*, beating protestors with batons and fists, throwing protestors to the ground, and ultimately arresting many of the protestors without lawful justification and without fair warning. All of these actions were without lawful justification and done in an effort to silence those speaking out against ongoing war and the deprivation of basic human rights.

3. Plaintiff brings this action for compensatory damages, punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of his civil rights, as such

rights are secured by those statutes and by the Constitution of the United States, and pursuant to New York City Administrative Code §§ 8-802 and 803(a-c).

4.    Protesters have been physically restrained with handcuffs in such a manner that caused them unnecessary pain and suffering. They have also been subjected to lengthy and unnecessary arrest processing.

5.    Defendants used these tactics to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights.

6.    The NYPD's behavior, organized for the purpose of suppressing Plaintiff's speech by the use of violent tactics and indiscriminate mass arrests, has been personally directed and/or permitted by the leadership of the City and NYPD, such as former Mayor Eric Adams, former NYPD Chief of Patrol John Chell, and former Deputy Mayor for Public Safety Kaz Daughtry.

7.    Plaintiff's claims for false arrest, excessive force, violation of First Amendment rights, First Amendment retaliation, municipal liability under *Monell v. Department of Social Services*, and violations of New York City Administrative code accrued on May 18, 2024, the date on which he was arrested.

8.    Plaintiff seeks herein redress for the constitutional injuries inflicted on him by Defendants under color of law.

## JURISDICTION

9.    This action is brought in this Court pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

- 2 -

10.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

11.    This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's claims pursuant to New York City Administrative Code §§§ 8-801, 8-802 and 803(a-c) because all of those claims derive from the same nucleus of operative facts as Plaintiff's federal claims and are part of the same case or controversy that gives rise to the federal claims and causes of action here.

## VENUE

12.    Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because a substantial part of the events giving rise to the claim occurred in this District.

## JURY DEMAND

13.    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

14.    At all times hereinafter mentioned, Plaintiff Muhamed Boja was a resident of New York County in the City of New York, State of New York.

15.    At all times hereinafter mentioned, Defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by the virtue of the laws of the State of New York and acts by and through its agencies, employees, and agents, including (but not limited to) the New York City Police Department ("NYPD") and their employees.

16.    Defendant NYPD Lieutenant Joan A. Ferreira, Tax #941746, was at all times relevant to the complaint a member of the NYPD. He is sued individually and in his official capacity.

17.    Defendant NYPD Luis Hiraldogarcia, Tax #963570, was at all times relevant to the complaint a member of the NYPD. He is sued individually and in his official capacity.

18.    The true names of Defendant John / Jane Does #1-4, as noted throughout this complaint, are currently unknown to Plaintiff.

19.    At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.

20.    At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

21.    Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by Defendant City.

22.    Defendants were duly appointed and acting officers, servants, employees, and/or agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

23.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices, and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

24.    At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

25.    Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

26.    Each individual Defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

27.    Plaintiff Muhamed Boja is a 22-year-old nursing student at Monroe University in The Bronx.

28.    On May 18th, 2024, Mr. Boja attended a Nakba Day rally in Bay Ridge, Brooklyn, to show support for the anti-war protest in acknowledgement of human rights. The community of Bay Ridge has held a peaceful Nakba Day rally annually for nearly ten years. Mr. Boja learned about the 2024 demonstration on social media.

29.    Mr. Boja arrived at the protest at 11:00am or 12:00pm. He peacefully chanted and marched alongside the other attendees, mostly students, who had congregated in Bay Ridge.

30.    Members of the NYPD were present throughout the day, directing protesters to move onto the sidewalk, but were otherwise not engaging very aggressively.

31.    That changed at about 4:00pm or 5:00pm, when police officers began pushing and shoving people.

32.    Mr. Boja decided to make his way home and crossed Bay Ridge Avenue, between Bay Ridge Place and 3rd Avenue, towards the sidewalk on the southern side of the street.

33. While crossing Bay Ridge Avenue, Mr. Boja heard a police order to move onto the sidewalk. He complied and began walking faster.

34. About three feet away from the sidewalk, Mr. Boja was shoved hard from behind, causing him to stumble. He turned around and saw a police officer.

35. Suddenly, about five officers, including Defendants Ferreira and Does, rushed Mr. Boja from all angles, grabbing his limbs and tackling him to the ground. One officer punched him in the stomach.

36. As he was aggressively pushed to the ground, Mr. Boja hit his head and began bleeding from an open gash on his forehead, causing serious pain.

37. With his stomach down on the ground, Mr. Boja felt an officer's knees forcefully pressing into the side of his ribs.

38. The officers shackled handcuffs tightly around his wrists and stood him up.

39. At no point did Mr. Boja resist. He was not engaged in any violent or threatening behavior and there was no reason for the Defendants to use any force against Mr. Boja, much less the actual force employed.

40. During the assault, some of Mr. Boja's property was also damaged, including his cellphone.

41. Rather than issuing Mr. Boja a summons or other legal process on the street, Defendant Hiraldogarcia placed Mr. Boja in the back of a small NYPD van. Mr. Boja then asked for medical attention to treat his painful head wound, which was still bleeding. Defendant Hiraldogarcia declined to bring him such attention, despite the visibility of the gash and the inherent risks of a head injury, telling Mr. Boja to simply wait.

42.    Mr. Boja waited in the back of the van for some time while officers placed two or three more people there along with him. His wrists remained in the excessively tight handcuffs. Although Mr. Boja complained about the tightness of the handcuffs, and the pain from the injury to his head, the NYPD officers present did not provide any medical relief and refused to loosen the handcuffs.

43.    At some point, Mr. Boja and the other people in the van were transferred into a larger bus filled with more people arrested at the demonstration. They were then transported to NYPD headquarters at One Police Plaza in Manhattan, arriving two to three hours after Mr. Boja's initial arrest. He remained cuffed throughout this entire time, with his forehead still bleeding and in pain from the aching of his head and the wound.

44.    Once they arrived at One Police Plaza, Mr. Boja and the other people exited the bus and waited outside for another hour and a half. He was still restrained by the excessively tight handcuffs.

45.    Defendant Hiraldogarcia then handed them off to another officer, who brought them inside and placed them in a holding cell alongside some other people who were already there.

46.    Before Defendant Hiraldogarcia left, Mr. Boja asked him again for medical attention to treat his head wound. Defendant Hiraldogarcia told him the officers inside One Police Plaza would take care of him. Mr. Boja also asked what would happen to him, but Defendant Hiraldogarcia replied that he merely had to wait.

47.    Once inside One Police Plaza and the holding cell his handcuffs were finally removed but the NYPD continued to fail to provide any needed medical attention to Mr. Boja.

48.    Mr. Boja remained in the holding cell for another four to five hours, while his head was still bleeding. He felt lightheaded and severe pain.

49.    Mr. Boja was then taken for finger printing and photographing before being placed back in the holding cell.

50.    An hour or two later, at or around about 1:30am, Defendant Hiraldogarcia gave Mr. Boja a Desk Appearance Ticket that was returnable on June 7, 2024, and had listed as the charge, PL 205.30,  Resisting Arrest, and walked Mr. Boja out of One Police Plaza.

51.    The next day, on May 19th, 2024, Mr. Boja sought medical attention at New York-Presbyterian Hospital. He was diagnosed with a concussion and was advised to rest his body.

52.    Mr. Boja rested and returned to school but found himself struggling to focus.

53.    On the return date, the New York County District Attorney's Office declined to prosecute Mr. Boja.

54.    Mr. Boja then filed a complaint with the Civilian Complaint Review Board ("CCRB").

55.    After an investigation, the CCRB informed Mr. Boja in a November 13, 2025 letter of its findings. The Board substantiated his allegations that Defendant Ferreira used a chokehold against an individual, restricted an individual's breathing, and used physical force against an individual.

**The NYPD's Permissive Response to Other Demonstrations**

56.    The NYPD's violent response to the anti-war protests discussed herein was dramatically different from their response to other kinds of protests and rallies.

57.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors,

making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[1]

58.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter-protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[2]

59.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[3]

### The NYPD's History of Mishandling Certain Protests

60.     The extensive deprivations of constitutional rights suffered by Plaintiff here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests against the

---

[1] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue- brooklyn-dyker-heights
[2] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused- protecting-violent-blue-lives-matter-marchers-bay-ridge
[3] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat- dissenters-over-covid-lockdown.

the Iraq War in 2003, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

61.    The NYPD response to pro-Palestine protests is in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

62.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[4]

63.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[5]

64.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, anti-war and other, similar protests, over the intervening years.

65.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has Plaintiff in this case.

66.    In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their

---

[4] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), available at
https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[5] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases, the most recent of which was filed in August of 2025:

a. *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

b. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

c. *Moussa et al. v. City of New York*, 1:25-cv-00442 (S.D.N.Y. March 15, 2025) (lawsuit arising from October 21, 2023 pro-Palestine march alleging, *inter alia*, that members of the NYPD engaged in policing motivated at least in part by discrimination against Arab, and Muslim protestors; that members of the NYPD kettled, violently assaulted, and falsely arrested protestors as a pretext to disrupt and ultimately end the protest);

d. *Makkawi v. City of New York*, 1:25-cv-6321 (S.D.N.Y. August 11, 2025) (class action alleging, *inter alia*, that members of the NYPD engaged in policing motivated at least in part by content- or viewpoint-based discrimination against pro-Palestine protests; that members of the NYPD used excessive force against and falsely arrested protesters).

### The NYPD's Policy and/or Practice of Using Excessive Force to Control the Speech of Protesters

67.    Defendants used types and levels of force that were excessive and unnecessary force against Plaintiff.

68.    The uses of force against Plaintiff were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

- 11 -

69.     However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

70.     In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG- NYPD")[6], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

      a.  NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

      b.  NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

      c.  NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

      d.  NYPD training does not adequately focus on de-escalation; and

      e.  In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

71.     After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents." *See* OIG-NYPD Report at p. 2 *et seq.*; *see also* NYPD Patrol Guide Section 221-01[7] ("Force Guidelines")

---

[6] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).
[7] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.

and 221-02[8] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

72. Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[9]

73. Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

74. Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

75. More recently, following the NYPD's use of excessive force against Black Lives Matter protests beginning in May 2020, New York State Attorney General Letitia James held hearings on June 17, June 18, and June 22, 2020 about the NYPD's Response to Demonstrations

---

[8] Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.
[9] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[10]

76.    The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protests.[11]

77.    The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[12]

78.    *The People of the State of New York v. City of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.*, 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.*, 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[13]

79.    Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021, the NYPD has

---

[10] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020)
https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[11] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020)
https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2 020.pdf

[12] *Id.* at 35.

[13] Stipulated Order, *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924, ECF No. 1099-2.

continued to engage in actions related to policing antiwar and human rights demonstrations such as the ones described herein, violating Plaintiff's constitutional and other rights.

### The NYPD's Failure to Train Regarding Policing Protests

80. Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

81. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

82. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

83. Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

84. The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "proactive" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

85. Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

86. These "disperse and demoralize" tactics and trainings have persisted through the present.

87.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

88.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

89.     On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

90.     Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia*, the following:

    a. The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

    b. The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c. The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

    d. The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead training focused almost exclusively on tactics designed to "disperse and demoralize" protesters; and

    e. The failure to ensure police response to protests and other protected activities are not based on the content thereof.

f. The failure to ensure police response to protests and other protected activities are not based on the appearance, nationality or culture of protestors.

91. Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

92. Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

93. Despite the wealth of evidence of NYPD members' historic brutality against protesters, Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

94. At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific,

- 17 -

relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff.

95.    Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian.

**The NYPD's Failure to Discipline Prior Misconduct**

96.    A custom of the NYPD's failure to appropriately discipline NYPD officers and officials' prior misconduct is characterized by:

a. failing to discipline NYPD officers and officials who committed civil rights violations;

b. ordering and encouraging NYPD officers and officials to cover up civil rights violations committed by fellow officers and subordinates;

c. disciplining and criticizing NYPD officers and officials who refused to cover up civil rights violations committed by fellow officers and subordinates;

d. failing to train NYPD officers and officials on the circumstances in which discipline for civil rights violations must or may be imposed;

e. vesting NYPD officers and officials with too much discretion in deciding when to discipline fellow officers and subordinates for civil rights violations;

f. failing to investigate circumstances in which NYPD officers and officials committed civil rights violations or covered up civil rights violations committed by fellow officers and subordinates;

g. assisting NYPD officers and officials who committed civil rights violations in covering up wrongdoing; and

> h. rewarding NYPD officers and officials who cover up civil rights violations committed by fellow officers and subordinates (collectively, "**Discipline Policies**").

97. There is robust evidence of Defendants' prior misconduct and/or failure to appropriately discipline Defendants' prior misconduct, which otherwise may have resulted in the avoidance of the denial of Plaintiff Boja's constitutional and civil rights.

98. For example, the CCRB substantiated 22 allegations against Defendant Ferreira including allegations that he abused his authority while stopping, searching, and frisking an individual, damaging and seizing property, and entering and searching non-publicly accessible areas in October 2017. Defendant Ferreira forfeited 18 vacation days to resolve one CCRB matter.[14]

99. The CCRB also substantiated four allegations against Defendant Ferreira that he abused his authority while frisking and searching an individual, improperly using a body-worn camera, and refusing to provide his name in October 2023. His penalty was the loss of three vacation days.[15]

100. Just a few months later, the CCRB substantiated three allegations against Defendant Ferreira that he abused his authority while interfering with a recording, was discourteous with the use of a particular word, and used offensive language related to a disability. A decision on a penalty is pending.[16]

101. Defendant Ferreira has also been named in a number of lawsuits, resulting in a total of $110,001 in settlements.

---

[14] *See* https://www.50-a.org/officer/MRZF.
[15] *Id.*
[16] *Id.*

102.    For example, in April 2015, Defendant Ferreira was accused of false arrest and malicious prosecution for allegedly supplying false allegations to the New York City Administration for Children's Services that the plaintiff was neglecting and/or endangering her children. The charges were later dismissed. The case resulted in a $55,000 settlement.[17]

103.    In November 2018, Defendant Ferreira was accused of deliberately swerving his police vehicle and striking the plaintiff, knocking him off his bike and causing him to land on the windshield of the police vehicle before falling to the ground. The case resulted in a $46,001 settlement.[18]

104.    For Defendant Hiraldogarcia, the CCRB substantiated one allegation, that he abused his authority by failing to provide his business card under the Right to Know Act in March 2023. He suffered no penalty.[19]

105.    Defendant Hiraldogarcia was also named in a lawsuit in December 2021, which alleged that he unlawfully approached, searched, assaulted, battered, arrested, and detained the plaintiff. The case resulted in a $30,000 settlement.[20]

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

106.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

---

[17] *Id; Wilson, et al. v. City of New York, et al,* 1:15-cv-03192, Dkt. No. 1 (S.D.N.Y.).
[18] *Id; Ramirez v. City of New York, et al,* 1:18-cv-11089, Dkt. No. 1 (S.D.N.Y.)
[19] *See https://www.50-a.org/officer/4BMB*
[20] *Id; Bennett v. City of New York, et al,* 161264/2021, Dkt. No. 1 (Sup. Ct. of N.Y.)

107.    Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing them to seize Plaintiff, was unreasonable, and was done without privilege or lawful justification.

108.    Plaintiff did not give consent and was conscious of his confinement by Defendants.

109.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

110.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

111.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
#### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

112.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

113.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that Defendants found themselves in.

114.    Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury without making individualized

or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

115. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

116. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

117. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

118. In committing the acts and omissions set forth herein, the Defendants acted under color of state law, individually and in concert, without lawful justification to deprive Plaintiff of his right to speech, expression and to assemble in violation of the First and Fourteenth Amendments to the United States.

119. The Defendants' retaliatory restrictions Plaintiff complains of herein imposed upon Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiff's protected conduct that:

> a. Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

b. Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened or limited; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

120. As a result of the Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

121. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

122. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

123. Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

124. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

- 23 -

125.    Defendants engaged in the acts and omissions complained of herein in an effort to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

126.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

127.    Additionally, as discussed herein, Defendant City designed/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment rights.

128.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

129.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

130.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

131.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering psychological

and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

132. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Failure to Intervene

133. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

134. Plaintiff was not engaged in any wrongdoing when he was tackled, assaulted and arrested by members of the NYPD.

135. Numerous John Doe defendants were present when this occurred.

136. These John Doe defendants were able to observe that the Plaintiff had not engaged in any criminal conduct and not engaged in any wrongdoing whatsoever.

137. These John Doe defendants had the ability to intervene and stop the unconstitutional detention and assault of Mr. Boja.

138. These John Doe defendants failed to intervene and stop the unconstitutional assault and detention of Mr. Boja.

139. As a result of the Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, City and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SIXTH CLAIM FOR RELIEF

**Municipal Liability**
*Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658
(1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, Fifth
and Fourteenth Amendments to the United States Constitution*

140.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

141.    Defendants Ferreira, Hiraldogarcia, and Does, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

142.    The aforementioned customs, policies, usages, practices, procedures and rules Defendants subjected Mr. Boja to include, but were not limited to:

    a.    Uses of excessive force, false arrests, and unreasonable restrictions on First Amendment-protected conduct, often without fair warning;

    b.    Employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning;

    c.    Engaging in retaliatory enforcement of violations against perceived participants in First Amendment assemblies, particularly Palestine-related protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning;

    d.    Failing to loosen or remove over-tight cuffs;

    e.    Subjecting arrestees to lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy conditions of confinement, in lieu of brief street detentions; and

    f.    Failing to discipline prior misconduct.

143.    The aforementioned customs, policies, usages, practices, procedures and rules challenged herein also include, without limitation:

    a.    Conduct that was viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling

governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, Charging, or arresting and charging with a different offense, people under VTL § 1156(a), despite the charge either literally or all but literally never being used except for people at protests, as part of a practice to have always-available pretextual cause to arrest people engaged in First Amendment Activity;

b.  Using excessively tight handcuffs as a means of punishing protesters for their speech; lacking available means to loosen or remove handcuffs; leaving tight handcuffs on for hours and only ever removing them at mass arrest processing locations; allowing a culture and de facto practice of disregarding both written policy and manufacturer/medical instructions that plastic cuffs must (1) only be used on non-resisting arrestees and (2) be removed immediately after complaints of tightness; and similar disregards for the seriousness of the risks that accompany zip-tie cuffs;

c.  Either officially sanctioning or allowing a culture to fester where command/"white-shirt" level officers attack and escalate, rather than facilitate and de-escalate, protests, and move in with maximum force, use batons to the head, punches, and other extreme uses of force routinely and for "play" and "fun"[21];

d.  Using mass arrests as a standard response to protests, arresting protesters for group probable cause-based arrests, and the like; and

e.  Failing/refusing to issue process on the street for specifically protest arrests.

144.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

145.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

---

[21] *See, e.g., Rodriguez v. City Of New York*, 21-cv-10815, ECF No. 107-1 (SDNY) (text messages from Captain Delgado, that the City fought to keep sealed, where he refers to assaulting protesters as "play," is told by a subordinate to "kick their ass," and says "LET'S HAVE FUN" referring to a Black Lives Matter protest in Mott Haven in the Bronx). Upon information and belief, neither he nor the relevant subordinate were disciplined.

## SEVENTH CLAIM FOR RLEIEF

### N.Y.C. Admin. C. §§8-801 *et seq.*, "Qualified Immunity Repeal"
### Claims Against All Defendants

146.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

147.    The New York City Administrative Code §8-803 provides as follows in relevant part:

a.  "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

b.  "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

c.  "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

148.    Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the individual Defendants are all considered covered individuals. §8-801.

149.    Plaintiff is a "person aggrieved" because she was (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

150.    Defendant City is liable as an employer, as set out above.

- 28 -

151.    Defendants' uses of force against Plaintiff were unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

152.    Defendants' detention and arrest of Plaintiff was unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

153.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

154.    Moreover, each member of the NYPD is required to intervene to stop the unlawful use of force against Mr. Boja, and his unlawful detention, yet they failed to do so when they had the opportunity.

155.    Further, it is not a defense to liability under §§8-801 et seq. that a covered individual has qualified immunity or any other substantially equivalent immunity.

156.    Thus, the Court should award both compensatory and punitive damages against all parties (including the City), an order restraining future conduct, and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Muhamed Boja demands judgment against the Defendants on each cause of action in amounts to be determined upon the trial of this action, inclusive of punitive damages and attorneys' fees, and inclusive of costs and disbursements of this action and inclusive of statutory interest on such damages, costs and fees, and such other relief as is appropriate under the law, and that the Plaintiff recover the cost of the suit herein, including reasonable attorney's fees pursuant to 42 U.S.C. § 1983, 1988, and including reasonable attorneys' fees and court costs pursuant to N.Y.C. Admin. Code §§ 8 – 805.

Dated: New York, New York
　　　　April 2, 2026

WYLIE STECKLOW PLLC

By: _____
Wylie Stecklow
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566-8000

Kawan Lovelace
Lovelace Law PLLC
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019

*Attorneys for Plaintiff*